GLENN E. SMITH
GLENN E. SMITH & ASSOC.
Bar. No. 5-1570
216 Longs Peak Dr.
Cheyenne, WY 82009
(307) 635-4912

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

FEB 22 2011

Stephan Harris, Clerk
Cheyenne

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **MICHAEL G. LEE**, a Wyoming resident, ) ) ) Plaintiff, ) ) ) vs. ) ) ) **LIFE INSURANCE COMPANY OF** ) **NORTH AMERICA**, a Pennsylvania ) Corporation, ) ) Defendant. ) | Case No. 11CV067-J |

## COMPLAINT

COMES NOW the Plaintiff in the above referenced action, by and through his attorney of record, Glenn E. Smith, and for his claim for relief against the Defendant, Life Insurance Company of North America, Plaintiff alleges and states as follows:

## PARTIES AND PRINCIPLES TO THE ACTION

1. Plaintiff Michael L. Lee (hereinafter "Plaintiff") is a resident of Wyoming. At all times relevant to the allegations set forth in this Complaint, Plaintiff was employed as a crystallizer operator by FMC Corporation in Green River, Wyoming and insured under the FMC Corporation employee benefit plan.

2. Life Insurance Company of North America ("LICNA") is a life and health insurer incorporated in the State of Pennsylvania and is licensed to transact the business of insurance in the State of Wyoming as a foreign insurer. The FMC Corporation employee benefit plan was underwritten by LICNA through a group disability insurance policy issued by to FMC. LICNA serves in a fiduciary capacity as the claim administrator under the long-term disability portion of the Plan.

3. FMC Corporation ("FMC") is a chemical manufacturing company incorporated and headquartered in Pennsylvania and has a manufacturing plant in Wyoming. FMC has established and administers an employee benefit plan on behalf of its eligible employees, including the Plaintiff. Included as part of the Plan is a long-term disability policy issued by LICNA to FMC under which the Plaintiff was insured.

## JURISDICTION AND VENUE

4. All claims for relief set forth in the Plaintiff's Complaint are governed by the terms and provisions of the Employers Retirement and Income Security Act of 1974 ("ERISA"). This action is brought pursuant to 29 U.S.C. §1132(a)(B).

The Court has jurisdiction over the claims asserted by the Plaintiff in this action pursuant to 29 U.S.C. §1132(e)(1).

5. Because the FMC employee benefit plan was administered in this district, in part, and the breach of that plan occurred in this district, venue in this Court is proper under 29 U.S.C. §1132(e)(2).

## STANDARD OF REVIEW AND EXHAUSTION OF REMEDIES

6. The FMC employee benefit plan may include language sufficient to create an arbitrary and capricious standard of review of LICNA's claim decision in this case.

7. If an arbitrary and capricious standard of review is found to be applicable, LICNA is an inherently conflicted fiduciary under the facts and circumstances of this action because it serves as the claim administrator of the FMC employee benefit plan with authority to approve or deny claims, but also stands to benefit financially from the claim decisions it makes. That conflict, therefore, must be considered as a factor in whether the Plaintiff's denial of benefits was arbitrary and capricious. The same conflict also reduces any deference that may be otherwise accorded to LICNA's claim decision under an arbitrary and capricious standard of review.

8. On September 23, 2010, following the termination of his disability benefits by LICNA, Plaintiff filed an administrative appeal requesting that LICNA's decision be reversed. By letter dated October 18, 2010, LICNA upheld its original decision to terminate benefits. Therefore, Plaintiff has exhausted his administrative remedies under the FMC employee benefit plan.

## STATEMENT OF FACTS

9.     Plaintiff is now 57 years of age and resides with his family at 1520 E. Teton in Green River, Wyoming.

10.    Plaintiff was employed in 1987 by FMC Corporation in Green River, Wyoming as a crystallizer operator, a position he held until his disability prevented him from further work in November of 2007. As a full-time employee Plaintiff was eligible for, and enrolled, in the FMC employer benefit plan. That Plan provided long-term disability benefits in the event Plaintiff became totally disabled from work.

11.    In October of 2000, while at work, Plaintiff injured his back while trying to open a heavy valve. That injury resulted in severe pain to Plaintiff's right leg and lower back.

12.    On October 26, 2000, Plaintiff underwent a right L5-S1 discectomy performed by Dr. Richard H. Schwartz in Salt Lake City, Utah. This surgery temporarily lessened Plaintiff's pain and Plaintiff was able to continue working for a time.

13.    In 2004, the pain in Plaintiff's lower back and right leg returned. Dr. Schwartz at that time performed a repeat MRI and Plaintiff was informed that there was scarring in the L5-S1 region. At Dr. Schwartz's recommendation, Plaintiff continued a conservative course of physical therapy with pain medication.

14.    The pain in Plaintiff's lower back and right leg persisted in 2006 and 2007 and he continued to seek treatment from Dr. Schwartz. In October and

November of 2007, the pain became unbearable and Plaintiff could no longer perform the duties of his job with FMC. Plaintiff's last day of work was November 29, 2007. He has not worked since that time because his level of pain has made it impossible for him to function at any job for any length of time.

15. In a further effort to alleviate Plaintiff's excruciating pain, Dr. Schwartz performed a lumbar interbody fusion and posterior fixation at L5-S1 on January 8, 2008. In the process substantial scar tissue around the S1 nerve root was discovered.

16. Again, Plaintiff's level of pain improved somewhat following his second surgery, but once again his intense pain returned in the summer of 2008. Because Dr. Schwartz did not believe that further surgery would be helpful, Plaintiff was prescribed Flexeril and Lortab to manage his pain and was referred to Utah Pain Specialists in Taylorsville, Utah for fadditional treatment.

17. After Plaintiff began treating with Utah Pain Specialists on September 2, 2008, the pain in Plaintiff's back and right leg became worse than before his second surgery. Plaintiff's pain was rated as 8 on a scale of 10. A lumbar epidural steroid injection was administered and Plaintiff's pain medication was switched from Lortab to Percocet.

18. Although Plaintiff experienced some relief from the injection, his pain returned to its previous level. Plaintiff returned to Utah Pain Specialists on September 19, 2008 and was given a caudal epidural steroid injection. Again the relief from pain was temporary and provided no lasting relief.

19. On October 14, 2008 Plaintiff returned to Utah Pain Specialists. Because the epidural injections provided no relief, a psychological evaluation and a spinal cord stimulator were recommended as treatment options.

20. Following this visit Plaintiff began experiencing severe pain in his leg left and thigh as well as his lower back and right leg. Because the pain had now spread to his left side, Plaintiff returned to Utah Pain Specialists on January 8, 2009. Plaintiff was informed that he had a bulging disc on the left side at L 2-3. Accordingly, Plaintiff was advised to have another epidural injection. Approval for a spinal cord stimulator had not yet been obtained.

21. Plaintiff's pain levels were the worst while standing, walking, or sitting for prolonged periods of time. He experienced lower pain levels by lying down with rest. Utah Pain Specialists increased Plaintiff's dosage of Lortab because the current dosage of Lortab was not effective in managing his level of pain.

22. On January 21, 2009, a third lumbar epidural injection was administered to Plaintiff. It proved to be equally ineffective. Plaintiff followed up at Utah Pain Management on January 30, 2009. At that time a spinal cord stimulator trial was scheduled. Plaintiff was prescribed Kadian along with Lortab.

23. On February 5, 2009 Plaintiff began a five-day spinal cord stimulator trial at Utah Pain Specialists and returned for a follow-up visit on February 11. Because the SCS trial offered no relief at all, it was determined that permanent placement of the stimulator would be equally ineffective.

24. At this time, Plaintiff's medications included Lortab 10/650 mg TID, Ambien 10 mg qhs, Cymbalta 30 mg qd, and Kadian 20 mg BID. The dosage for Kadian was increased to 30 mg daily and the dosage for Cymbalta was increased to 60 mg daily in an effort to see if higher dosages would be more effective.

25. Plaintiff returned to Utah Pain Specialists on April 3, 2009 and began taking Neurontin 300 mg orally three times a day. The following week, on April 10, Plaintiff received another caudal epidural steroid injection at L5S1. It was no more effective than any of the previous injections. Plaintiff was then informed that the only other surgical option was to remove the hardware from his first two surgeries.

26. Plaintiff followed up at Utah Pain Specialists on May 12, 2009. His medications were adjusted in an effort to find some combination of drugs that would be effective in relieving at least some of his pain. The dosages for Neurontin and Kadian were increased. Because of the side effects of these latter two drugs, Plaintiff discontinued their use. During his next visit on June 18, 2009 Plaintiff was started on Oxycodone four times daily in lieu of Lortab.

27. On July 18, 2009 Plaintiff returned to Utah Pain Specialists. The pain at this time had again increased to unbearable levels, beginning in the lower back and down the outside of his right leg. Pain in his left leg and groin grew worse. Oxycodone was effective to take the edge off some of the pain at times. However, Plaintiff was never free from disabling pain for very long.

28. On July 23, 2009, Plaintiff was administered a functional capacity evaluation in Salt Lake City, Utah. He gave maximum effort in the various tasks he was asked to perform. As Plaintiff informed the examiner, he was able to perform many of the physical exercises that formed part of the examination for a short period of time, provided he was willing to pay the price later that day and the next day. That turned out to be the case after completing his evaluation. Plaintiff was in extreme pain following the functional capacity examination for most of two days.

29. There is simply no way Plaintiff could perform this level of physical activity for more than a short period of time, much less eight hours a day, five days a week. While Plaintiff was able to walk, stand, sit, bend, push and pull weights, and climb stairs for a couple of hours he is not able to perform any of these tasks for a longer period of time on a day-to-day basis. Anytime Plaintiff attempted this level of physical exertion, he would spend the next day or two in bed, and on pain medication, trying to recover.

30. On Plaintiff's next return visit to Utah Pain Specialists on August 4, 2009, his pain was so bad that he requested any kind of interventional pain procedure that might have a chance at working. Another transforaminal epidural steroid was administered in an effort to block the pain in Plaintiff's back. It was ineffective.

31. Plaintiff returned to Utah Pain Specialists on August 19, 2009 and reported that the last epidural injection did nothing to alleviate his pain. He was advised to have a CAT scan of the lumbar spine in order to determine whether

his previous MRI had missed anything that may be causing intense levels of pain. Plaintiff was also taken off of Oxycodone and was prescribed Nucynta for pain.

32.     On September 2, 2009 the doctors at Utah Pain Specialists decided to administer a diagnostic lumbar medial branch block near the pedicle screw at L4 and L5 in a continuing effort to find some form of effective relief from pain. According to Plaintiff's medical records, he was diagnosed with lumbago, lumbar spondylosis, degenerative disc disease without myelop lumbar, and spinal enthesopathy.

33.     On September 19, 2009 Plaintiff returned to Utah Pain Specialists and pleaded with his physician to find something that would lessen his level of pain. His physician decided to perform a lumbar radiofrequency rhizotomy to relieve Plaintiff's pain by blocking the pain signals to spinal nerve roots.

34.     Plaintiff returned to Utah Pain Specialists on October 21, 2009 and told his physician that the procedure was ineffective. He also reported that Nucynta was more effective than the Oxycodone at relieving pain but that the results had no lasting effect. The dosage for the Nucynta was increased.

35.     On November 10, 2009, a sacral selective nerve root block was administered to Plaintiff by Utah Pain Specialists. It was ineffective. The Nucynta also lost its effectiveness and Plaintiff was switched back to Ocycodone.

36.     In early 2008, it became obvious to Plaintiff that he would not be able to work again on a full time basis. Accordingly, he applied for long-term disability benefits under the CMW plan. By letter dated April 1, 2008, Plaintiff's

claim was approved by LICNA. His first benefit disability check of $674.96 covered the period from May 28, 2008 to June 27, 2008.

37. Plaintiff continued to receive monthly benefits for the following two years. However, Plaintiff was notified by LICNA on November 9. 2009 that his claim would be reviewed to determine whether his benefits would continue past May 28, 2010, at which time the definition of total disability would change from "own occupation" to "any occupation."

38. Plaintiff subsequently received a letter from LICNA dated November 19, 2009 informing him that his long-term disability benefits would be terminated, effective May 28, 2010, because at that time LICNA would no longer consider him totally disabled under the "any occupation" policy definition of total disability. In other words, LICNA determined six months before Plaintiff's benefits were terminated that he would no longer be considered disabled under the LICNA long-term disability policy.

39. In fact, Plaintiff's level of pain was significantly worse in May of 2010 than is was in November of 2009, a fact which LICNA could not possibly have considered inasmuch as LICNA had already made up its mind in November of 2009, six months before Plaintiffs benefits were termination, that Plaintiff would no longer be considered disabled by LICNA.

40. In terminating Plaintiff's claim for long-term disability benefits, LICNA relied almost exclusively on the results of a functional capacity evaluation that was performed on July 2009, almost a year before the two-year "own occupation" period under the policy expired. Again, even if the results of the

functionality capacity evaluation supported a finding that Plaintiff could perform any job for which he was qualified in July of 2009, which Plaintiff denies, LICNA assumed that Plaintiff's condition would remain static for the next eleven months or that the tasks that Plaintiff could perform in May of 2010 were the same tasks he may have been able to perform in 2009.

41. In fact, Plaintiff's level of pain grew progressively worse between November of 2009 and the present date. Plaintiff's doctors have been unable to find any treatment that would offer him significant relief from the constant, debilitating pain he experiences, even though they have twice performed surgery, prescribed physical therapy, and injected Plaintiff on multiple occasions with epidurals, steroids and root blockers.

42. Even the many different types of narcotic pain relievers that Plaintiff's doctors have prescribed have been largely ineffective to reduce Plaintiff's pain level beyond short periods of time. Moreover, the effects of the medication Plaintiff took were themselves disabling, making him groggy, fatigued, and unable to concentrate.

43. While Plaintiff's functional capacity evaluation over the two hours or so that he was examined may have shown that he could perform work-related duties in "a medium capacity occupation," the evaluation did not nor could not show that Plaintiff was able to engage in the same physical tasks over an eight hour day, five days a week, fifty-two weeks a year.

44. Plaintiff has never claimed that he was unable to perform the tasks involved in the functional capacity evaluation for short periods of time. If Plaintiff

attempted to perform the same types of tasks over a longer period of time, however, such as for an entire day, the resulting pain would be so excruciating that Plaintiff would become totally incapacitated for days. Any physical activity greatly exacerbated Plaintiff's level of pain, with no means of relief except the ingestion of narcotic pain medication.

45. Moreover, Plaintiff was well rested and felt better than usual on the day of his functional capacity evaluation. If Plaintiff had undergone the same evaluation when his pain levels were high, or following a day when he was unusually active, Plaintiff would not have been able to undergo this evaluation. No one followed up with Plaintiff to determine what his level of pain was following his functional capacity evaluation.

46. Thus, Plaintiff was able to engage in some light physical activity for short periods of time. He is unable to perform the duties of any occupation for which he is qualified, however, because of the pain produced by any type of prolonged physical activity, even standing, sitting, or walking. The only way Plaintiff was able to manage his level of pain on any consistent basis, besides taking narcotic drugs, was to lay down whenever his pain intensified.

47. While theoretically there may be jobs available for someone with Plaintiff's experience and education who can actually work on a full time basis, no employer in the real world would hire a 57 year old male with two back surgeries, constant, debilitating pain, and a daily diet of narcotic pain relievers.

48. Following LICNA's termination of Plaintiff's long-term disability benefits, he returned to see Dr. Richard H. Schwartz for evaluation. Dr.

Schwartz concluded in a letter dated January 8, 2010: "In my opinion, I do not think he can be gainfully employed with his continuing level of pain requiring major narcotic medications."

49.   In a follow up visit to Utah Pain Specialists dated February 3, 2010, Plaintiff also received a written evaluation concluding: "We do not feel that he can be gainfully employed with his current level of pain requiring opiate medication."

50.   By letter dated September 23, 2010, Plaintiff appealed LICNA's termination of his disability benefits and submitted letters from Dr. Schwartz and Utah Pain Specialists stating that Plaintiff was not capable of working on a full-time basis.

51.   By letter dated November 19, 2009 LICNA upheld the termination of Plaintiff's disability benefits, again relying on Plaintiff's functional capacity evaluation showing that Plaintiff was capable of performing a medium capacity occupation and a transferable skills analysis listing several occupations which, according to LICNA, Plaintiff would be able to perform in view of his work experience.

52.   At no time did LICNA ever request that Plaintiff undergo an independent medical evaluation to determine whether the medical opinions of Dr. Schwartz and Utah Pain Specialists were erroneous or somehow invalid.

## CLAIM FOR RELIEF PURSUANT TO 29 U.S.C. 1132(a)(1)(B)

Plaintiff re-alleges all facts set forth elsewhere in his Complaint as if fully set forth in his Claim for Relief and further alleges and states as follows:

53. At all times material to the facts alleged in this Complaint, the FMC employee benefit plan was subject to and governed by ERISA.

54. Plaintiff's Claim for Relief is asserted under the provisions of 29 U.S.C. §1132(a)(1)(B), which empowers the beneficiaries of an employee benefit plan, such as the Plaintiff, to recover benefits due under the terms of the plan and to enforce their rights under the terms thereof.

55. If the standard of review in this action is one requiring an arbitrary and capricious claim decision, Plaintiff is entitled to recover all benefits due under the terms of the plan because LICNA acted arbitrarily and capriciously in terminating Plaintiff's long-term disability benefits. LICNA's arbitrary and capricious termination of benefits occurred in numerous ways, including but not limited to, the following:

a. In deciding that Plaintiff was able to work in "any occupation" for which he was qualified, LICNA completely ignored and totally failed to credit Plaintiff with the opinion of his treating physicians -- that he was medically unable to engage in gainful employment.

b. In terminating Plaintiff's benefits, LICNA totally ignored, or refused to consider, the effect that constant, severe, and debilitating pain may have upon Plaintiff's ability of to engage in any type of full-time work.

c. LICNA also ignored the ability of Plaintiff to engage in work of any kind on a full-time basis while taking medication, with its disabling side effects, to relieve his pain.

d.      LICNA arbitrarily and capriciously made the decision to terminate Plaintiff's disability benefits six months before the benefits were ever set to expire on May 27, 2010, thus ignoring Plaintiff's medical condition at the actual time the policy definition changed from "own occupation" to "any occupation."

e.      LICNA based its decision to terminate benefits on a functional capacity evaluation that was nearly a year old at the time benefits were set to expire without ever requesting an independent medical examination or seeking out any medical support to support its claim decision.  Further, LICNA ignored and failed to consider that a functional capacity evaluation only measures a person's ability to engage in specified physical tasks during a few hours on the particular day the evaluation was made.

f.      LICNA completely failed to take into account the fact that any physical activity intensifies Plaintiff's pain, such that he is often unable to function on any level following such activity.

g.      LICNA failed to consider whether Plaintiff was able to perform the duties of any occupation on a full-time basis, eight hours a day, five days a week, fifty-two weeks a year.  Rather, LICNA's conclusion that Plaintiff was able to function in a "medium capacity" was based upon a two or three hour evaluation.

h.      While LICNA identified several occupations that an individual who can function at "medium capacity" on a full time basis may be capable of performing, LICNA totally failed to consider whether any employer in the real world would be willing to hire a 57 year old male with two back surgeries, constant pain, and a daily ingestion of narcotic pain relievers on a full time basis.

   i. LICNA failed to determine whether any of the occupations LICNA identified as occupations Plaintiff could physically perform were even available in Plaintiff's geographic area.

   j. In terminating Plaintiff's disability benefits, LICNA relied heavily upon the lack of objective medical evidence to support Plaintiff's disability. Yet nowhere in the LICNA summary plan description does LICNA require that disability be supported by objective medical evidence. Subjective evidence alone is sufficient to support a finding of total disability under the plan, yet LICNA ignored all such evidence when benefits were terminated.

   k. As a fiduciary charged with acting solely in the interests of the Plaintiff, LICNA was required to consider evidence supporting disability on an equal basis with evidence supporting its decision to terminate benefits. In contrast, LICNA only considered evidence favorable to its decision to terminate benefits. Further, LICNA was required to gather and evaluate evidence in support of Plaintiff's claim to the same degree and extent that it was required to gather and evaluate evidence to support its own termination of benefits. Yet LICNA made up its mind to terminate benefits six months before benefits were actually terminated without any attempt to impartially weigh all factors that prevented Plaintiff from working on a full-time basis.

   l. LICNA, as a fiduciary under ERISA, terminated Plaintiff's disability benefits under an inherent conflict of interest, making it all the more critical to obtain an independent medical opinion in support of its claim decision before arbitrarily and capriciously terminating such benefits.

56. Plaintiff reserves the right to rely upon additional evidence of arbitrary and capricious conduct as it may be disclosed by LICNA's administrative record once it is formally produced in this action.

57. For all the above reasons, and others, LICNA's decision to terminate Plaintiff's disability benefits was arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against LICNA for all benefits due the Plaintiff, including prejudgment interest and costs as allowed by law, reasonable attorney's fees as provided under 29 U.S.C. §1132(g)(1), and all other damages, remedies and forms of equitable relief allowable under 29 U.S.C. §1001 *et. seq.*

Dated this 21st day of February, 2011.

Respectfully submitted,

Michael G. Lee,

Plaintiff

BY: _____

Glenn E. Smith
Glenn E. Smith & Assoc.
216 Longs Peak Dr.
Cheyenne, WY 82009

Attorney for Plaintiff